IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 10, 2003 Session

**SHIN YI LIEN ET AL. v.
RUTH COUCH, ET AL.**

**Appeal from the Circuit Court for Wilson County**
**No. 9230     John D. Wootten Jr., Judge**

**No. M2002-01625-COA-R3-CV - Filed February 23, 2004**

This is the second time the parties have been before this court in a dispute over the purchase of emu chicks.  In this appeal, the Plaintiffs take issue with the trial court's limitation of damages recoverable under the Tennessee Consumer Protection Act.  We reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN, J., and CAROL L. MCCOY, SP. J., joined.

William Kennerly Burger, Murfreesboro, Tennessee, for the appellant, Shin Yi (Sunny) Lien and wife, Ann Lien.

Jeff Reed, Murfreesboro, Tennessee, for the appellees, Ruth Couch, Individually and Big Ridge Emu Ranch, Inc.

**OPINION**

The sole issue presented in this appeal is the proper measure of damages in an action under the Tennessee Consumer Protection Act that involved a contract for the purchase and sale of emu chicks.  Specifically, the purchasers were awarded a judgment for one half their deposit on the contract, but the jury was not allowed to hear that the sellers had obtained a judgment in another state against the purchasers for the full contract amount, and that amount was not included in the damages. Although the issue presented is limited, some factual and procedural background is necessary.

# I. FACTUAL BACKGROUND

The purchasers, Shin Yi (Sunny) Lien and his wife, Ann Lien, ("Liens"), who live in Wilson County, Tennessee, were primarily in the business of exporting kiln dried lumber. In late 1993, they decided to enter into the emu business. By the time of the events herein, they had spent around $370,000 on emus and had purchased approximately 40 birds.

In early February of 1994, the Liens saw an advertisement for emu chicks in the trade magazine *Emu Today and Tomorrow* placed by Big Ridge Emu Ranch[1] ("Big Ridge"). In addition to information about the ranch, the advertisement stated "1994 January and February Chicks."[2]

After seeing this ad, sometime in late February Ms. Lien telephoned Ruth Couch, the general manager of Big Ridge, regarding the purchase of ten (10) pairs of emu chicks. Several other telephone conversations took place. Ms. Couch testified that she explained to Ms. Lien that Big Ridge no longer had any January chicks, because they had already been contracted to persons who had called earlier. She also testified that she told Ms. Lien that there might be a few February chicks available and that she could fill their order from the 1994 hatch with all the remaining February chicks and with March and very early April chicks.

Ms. Lien testified that she stressed the Liens' interest in January and February chicks. Although she acknowledged that Ms. Couch had stated that there may not be enough chicks born in January and February left to sell, it was Ms. Lien's position that throughout the series of conversations, Ms. Couch understood that the Liens' wanted as many earlier born birds as possible.

Following the conversations between Ms. Lien and Ms. Couch, Ms. Couch faxed the Liens a proposed purchase contract setting forth the terms of the sale that provided for the sale of ten (10)

---

[1] Big Ridge is an Arkansas corporation located in Saline County, Arkansas.

[2] The full ad read:

Big Ridge Emu Ranch, Inc. [map of United States with arrows pointing to Arkansas]
Centrally Located
Lower Transportation Costs
Large Healthy Breeding Stock
1994 January and February Chicks
For Sale
Place Your Order Now
Check our Prices First
501-821-4900
Little Rock, Arkansas
Member American Emu Association
Arkansas Emu Association

pairs of 1994 unrelated chicks. The proposal contained a handwritten notation "10 pr. of Feb-March and possibly very early April."

A contract, filled in and signed by Ms. Couch, was faxed to the Liens, and Mr. Lien executed it on March 9 and returned it to Ms. Couch. The cover letter from Ms. Couch that accompanied the proposed contract stated, "We will furnish from the 1994 Hatch all of the Feb. chicks we have available and then March chicks, and early April, if necessary." Ms. Lien testified that Ms. Couch told her not to worry about what was on the paper.

In essence, Ms. Lien testified that she had a number of conversations with Ms. Couch and that she made it clear that the Liens only wanted birds born in January or February, or maybe some early March birds, at the price they agreed to pay. She thought that the contract and Ms. Couch's representations allowed the Liens to get out of the contract if it turned out there were not enough older birds available to satisfy the Liens. She thought they were clear in their understanding with Ms. Couch.

The contract was for ten (10) pairs of unrelated emus at $6,500 per pair for a total of $65,000. The contract provided that the Liens were to take possession of the birds within 10 days of the birds reaching 3 months of age. The contract provided for a 25% deposit, and the Liens sent a deposit to Big Ridge of $16,250 for the chicks.[3]

In May, the Liens drove to Arkansas and paid a visit to Big Ridge. The Liens testified that they went to the farm to see the birds they were actually buying, complete the transaction, pay the remaining amount due, and arrange for delivery. The Liens had not notified Ms. Couch that they were coming. Mr. Couch took Mr. Lien to look at the barn and the birds at the farm. Mr. Couch told Mr. Lien that the larger birds (January and February births) were already sold to other people. The Couches showed Mr. Lien a working paper with a listing of chicks on the farm, used by Big Ridge for internal purposes. According to Mr. Lien as well as other testimony, if the list were accurate, Big Ridge did not have ten unrelated pairs of emu chicks.

There was a great deal of disputed testimony about this internal worksheet, how Mr. Lien obtained it, the inaccuracies on it, and its relevance or lack thereof. Essentially, Ms. Couch stated that the working list was for internal purposes only and that some entries on it later proved inaccurate. Ms. Couch explained that prior to the pick up of birds, the veterinarian must be called to "sex" the birds, *i.e.*, determine or verify their gender, give them their shots, and prepare records that are necessary for interstate transport of the live birds. This is generally not done until close to the day of pick-up since it is both time consuming and expensive. Because the emu chicks are generally sold as unrelated pairs, the gender certification is a prerequisite to accurately filling an order.

---

[3]The Liens' check indicated the check was for "10 pr emus (3 mos) 25% down."

3

Another list was prepared later, after the veterinarian visit, reflecting the chicks Big Ridge assigned to the Lien contract. This second list reflected that Big Ridge intended to fill the Liens' order with one (1) chick born in February, sixteen (16) born in March, and three (3) born in April. However, this second list was prepared well after the Liens' May visit and was not given to the Liens until litigation began.

After his inspection of the birds and/or the working list, Mr. Lien became concerned that he could not be supplied with enough chicks of sufficient age to satisfy the Liens' needs and their intent. He testified that he was concerned that the order could not be filled with unrelated pairs as well as being angry that Big Ridge had no, or very few, older chicks to meet his order. Mr. Lien told the Couchs he did not want the birds and wanted to cancel the contract.

According to the Liens, the birth date of the chicks was significant to their value. Ms. Lien testified that the age of the birds affect their value because of the availability of an extra breeding season. Mr. Lien also testified as to the additional breeding season from the older birds and further stated that he would not have paid $6500 per pair for birds born in late March or later because they were not worth it. Although Ms. Couch disputed the general premise that January and February chicks are more valuable than March or April chicks, she conceded that the January and February birth dates of the birds, as listed in the advertisement, "is a selling point."

There were some further telephone conversations during the summer, and the parties' testimony about them varies. Ms. Couch testified that she discussed by telephone with the Ms. Lien their picking up their birds, but by mid-July her calls were not returned. Ms. Lien testified that when Ms. Couch called about picking up the birds, she was told that the Liens did not want the birds, as they had already informed the Couches. The Liens did not pay the rest of the contract price, and Big Ridge did not refund the Liens' deposit.

During 1994, the price of emu chicks fell. According to Ms. Couch, the estimated value of the birds had dropped to $2,500 per breeding pair by the summer. According to Mr. Lien, the dramatic drop in price came at the end of the year. The Liens insisted that their failure to pay the balance owed for the emus was not related to the dramatic drop in emu prices from when they had signed the contract, but with their dissatisfaction with Big Ridge's inability to fill their order according to their expectations. They provided evidence they were making other emu purchases.

While there was a great deal of direct contradiction in the testimony of the parties, the jury was the factfinder, and its verdict must be taken as resolving those disputes. Big Ridge has not challenged the verdict or the sufficiency of the evidence supporting it. Consequently, the preceding recitation of facts does not discuss all contradictory evidence.

## II. Prior Litigation

In August 1994, Big Ridge sued the Liens in Arkansas state court alleging breach of contract, seeking the balance of the purchase price of the chicks and other damages such as costs of boarding

the emus after the required pick-up date. The Liens counterclaimed for breach of contract, misrepresentation, and mutual mistake of fact. In October, 1995, after a bench trial, the Arkansas trial court found that the contract between the parties was clear and that the Liens had breached the contract. Accordingly, the trial court ruled in favor of Big Ridge and entered judgment against the Liens in the amount of $78,870 plus $2,800 in attorney's fees.[4] The Liens' counterclaims against Big Ridge and Ms. Couch were dismissed with prejudice. This judgment became final after the Liens dismissed their appeal.

During the pendency of the Arkansas case, the Liens filed a complaint in the Circuit Court for Wilson County, Tennessee, against Big Ridge and Ms. Couch in January, 1995, for violations of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq*. Specifically, the Liens alleged that Ms. Couch and Big Ridge violated the TCPA by placing the deceptive advertisement in *Emu Today and Tomorrow* in violation of various specific subsections of Tenn. Code Ann. § 47-18-104(b).

Big Ridge and Ms. Couch filed a motion to dismiss and in the alternative for summary judgment in the Tennessee case. The trial court granted the motion finding that the October 1995 judgment rendered by the Arkansas court served as *res judicata* as to the issues raised by the Liens in the Tennessee case. The Liens appealed, and this court vacated the dismissal, finding that *res judicata* did not bar the Liens' action because the Arkansas court did not have the power to grant the Liens the full measure of relief they sought under the TCPA. *Lien v. Couch*, 993 S.W.2d 53 (Tenn. Ct. App.1999).

Although this court concluded that Arkansas courts "would most likely" recognize and enforce a cause of action based on the Tennessee Consumer Protection Act, such courts would have applied Arkansas law as to remedies. *Id*. at 58. Because Arkansas law would not have allowed the Liens to recover either attorneys' fees or treble damages, both available under the TCPA, we concluded that the unavailability of those remedies created a formal barrier to the Liens' full recovery in the Arkansas proceeding and, consequently, the Arkansas judgment did not preclude the Liens' Tennessee suit. *Id*. at 58-59. The court's opinion concluded by stating:

> Our decision relates only to the *res judicata* issue upon which the trial court based its decision and should not be construed as foreclosing Big Ridge Emu Ranch and Ms. Couch from asserting any other defense available to them in the Tennessee proceeding.

*Id.* at 59.

The case was remanded for further proceedings consistent with the opinion. Those proceedings resulted in the judgment appealed herein.

---

[4]The Arkansas trial court did provide that the net proceeds of any subsequent sale of the emus in dispute be credited toward the judgment pursuant to the Uniform Commercial Code, Ark. Code Ann. § 4-2-709 (1961).

## III. The Proceedings Below

On remand, a three day jury trial took place on the Lien's TCPA claims. Those claims were based on the advertisement that caused the Liens to contact Big Ridge in the first place and Big Ridge's conduct thereafter. Specifically, the Liens claimed unfair or deceptive conduct that constituted the following violations of the Act: (1) advertising goods or services with intent not to sell them as advertised, in violation of Tenn. Code Ann. § 47-18-104(b)(9); (2) representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another, in violation of Tenn. Code Ann. § 47-18-104(b)(7); (3) advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity, in violation of Tenn. Code Ann. § 47-18-104(b)(10); (4) using statements or illustrations in any advertisement which create a false impression of the grade quality, quantity, make, value, age, size, color usability, or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services, in violation of Tenn. Code Ann. § 47-18-104(b)(21); and (5) engaging in any other act or practice which is deceptive to the consumer, in violation of Tenn. Code Ann. § 47-18-104(b)(27).

The jury returned a verdict for the Liens and answered specific questions, based on the language of the alleged TCPA violations, as follows:

> Did the Defendants advertise emus with the intent not to sell them as advertised? No.
>
> Did the Defendants represent that the emus were of a particular standard, grade or quality, or that the emus were of a particular style or model if they were of another? Yes.
>
> Did the Defendants advertise the emus with the intent not to supply reasonably expectable public demand for the emus unless the Defendants advertisement disclosed a limitation of quantity of emus? Yes.
>
> Did the Defendants use statements or illustrations in any advertisement which created a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the emus offered or which may otherwise misrepresent the emus in such a manner that later on disclosure of the true facts there was a likelihood that the buyer, the Plaintiffs, may be switched from the advertised emus to other emus? Yes.
>
> Did the Defendants engage in any other act or practice which was deceptive to the Plaintiffs or to any other person? Yes.

Thus, the jury found several violations of the TCPA. Next, the jury found that the Liens had sustained damages that were legally caused by Big Ridge and/or Ms. Couch. The jury awarded the Liens damages in the amount of $8,125, half of the deposit the Liens had paid to Big Ridge.

After a subsequent hearing, the trial court granted the Liens' request for treble damages under Tenn. Code Ann. § 47-18-109(a)(3), which authorizes courts to so increase damages upon a finding that "the use or employment of the unfair or deceptive act or practice was a willful or knowing violation." The court found that "the Defendants acted intentionally in the conduct which the jury has described in responses number 4 and 5 as an act or practice which was deceptive to the Plaintiffs." The court trebled the damages to $24,375 and further awarded the Liens their attorney's fees as provided in Tenn. Code Ann. § 47-18-109(e)(1). Thus, the Liens were awarded a total judgment of $33,025.

Big Ridge has not challenged the jury's findings or verdict, the damages awarded by the jury, the trial court's trebling of those damages, or any pre-trial rulings by the court on dispositive motions. Big Ridge and Ms. Couch raise no issues in this appeal. Consequently, we are not called upon to examine the verdict and judgment. Instead, both parties agree that this appeal involves only one issue, that is the Liens' challenge to the trial court's limitation as to their damages.

## IV. DAMAGES

The relevant measure of damages is set out in Tenn. Code Ann § 47-18-109(a) (1), which provides:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Thus, the statute allows as damages actual losses resulting from the deceptive act or practice, if the plaintiff can show an ascertainable loss. With respect to damages, the proper measure of damages is a question of law and therefore subject to *de novo* review with no presumption of correctness. *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998). Interpretation of a statute is also a question of law reviewable de novo. *King v. Pope*, 91 S.W.3d 314, 318 (Tenn. 2002). In addition, "[t]he Tennessee Consumer Protection Act is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." *Ganzevoort v. Russell*, 949 S.W.2d 293, 297 (Tenn. 1997), quoting *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992); Tenn. Code Ann. § 47-18-102(2). Another reason for liberal construction of the Act is to promote the policy of encouraging the development of fair consumer practices. Tenn. Code Ann. § 47-18-102.

The jury herein found that Big Ridge had engaged in conduct that the TCPA made unfair and deceptive and also found that the Liens had suffered loss resulting from those deceptive or unfair acts.

7

The jury heard evidence that the Liens had paid Big Ridge a deposit of $16,500, had never received the deposit back, and had received no emu chicks. No other proof of damages was presented, and the jury was not allowed to hear about the judgment against the Liens in the Arkansas litigation. That is the crux of the issue before us.

Prior to trial, Big Ridge filed a motion *in limine* asking the trial court to "exclude any proffered evidence or any mention by the Plaintiffs, Plaintiffs' counsel or other witnesses . . . that the amount of the judgment in the Arkansas litigation between the parties is an element of damages possibly recoverable by the Plaintiffs in this case." In a pretrial hearing on that and other motions, the court granted the motion *in limine* and held that the Arkansas judgment was not an element of damages in this case.[5]

The Liens' counsel then stated he agreed with that ruling and had attempted to reframe the request for damages.[6] Essentially, the Liens took the position that they should be allowed to claim as damages the full contract price because they never received the emus, that had they been able to obtain the emus they contracted for when they visited Big Ridge in May they would have received property worth the contract price of $65,000, and that they had suffered as a loss the value of the subject matter of the contract.[7]

The issue of the scope of damages came up again when Big Ridge moved for a directed verdict at the close of the Liens' proof. In pertinent part, Big Ridge asked the court to direct a verdict limiting compensatory damages to $16,250 because the only proof that had been offered as to damages was the Liens' payment of that amount as the deposit that was not returned. Again, the Liens argued that their actual loss exceeded the unrefunded deposit because they had never gotten the emus they had contracted for. They argued that what they were denied by the defendants' deceptive conduct was not just the deposit but the product they contracted for. In response, Big Ridge asserted that any argument regarding lost profits or other lost benefit to the Liens would be merely speculative,

---

[5]At the hearing on this and other motions, the trial court initially indicated it wanted counsel to refrain from bringing up the Arkansas litigation, but, after discussion with both attorneys, it became clear that some reference to that lawsuit would necessarily be made, and the court decided that limiting instructions would be necessary. That turned out to be the case. For example, when Ms. Couch was asked if Big Ridge had ever given the emus to the Liens, she explained that the Arkansas court had not required Big Ridge to do that, but that she had been advised to mitigate Big Ridge's damages by selling the birds elsewhere if possible. Similarly, on several occasions, attorneys impeached or attempted to impeach the parties' testimony by reference to their prior testimony in the Arkansas trial. Thus, the jury heard enough to know there had been a lawsuit in Arkansas, but were not informed about its outcome, the judgment against the Liens, or Big Ridge's attempts to enforce the judgment.

[6]In fact, earlier in the discussion, counsel for the Liens stated, "I'm not asking for the Arkansas judgment as an element of damages. I wouldn't think of that; that's obviously not appropriate . . . ."

[7]This discussion arose in the context of the court's consideration of the Liens' motion to amend their complaint to raise their request for damages to $300,000. The trial court granted the amendment, recognizing it was simply a ceiling.

8

and the court stated it would not allow such argument. The trial court granted the directed verdict limiting the actual damages to the amount of the deposit. The court observed that to allow the Liens to argue, and perhaps be awarded, the full contract price would amount to a "windfall" because "they still are just out the $16,250."

The discussion continued, and in response to the court's question of whether allowing the jury to award the $65,000 would put the Liens in a better position, the Liens' attorney stated:

> And I know I can't argue about what's happened in Arkansas, these people [Big Ridge] have taken their Arkansas contract and have reduced it to a judgment against my client for $80,000 plus interest, and that's what makes that Arkansas deal relevant to what has gone on in this case. They've cut a judgment against my client affirming the value of these birds as $65,000 plus, and we've got to pay. That's not speculative. I've got it; my clients have recorded upstairs in the registry of deeds office a judgment against them, against their property, that is stayed in the amount right now of in excess of $100,000 we're going to have to pay, and if you limit me to $16,000, I don't have a shot at it.

The trial court, we think correctly, interpreted this as an argument that the contractual obligation, secured by the judgment and lien, was an ascertainable loss of money or property that was fixed and not in dispute. While the court maintained that it would not let the Liens argue the judgment to the jury as an element of damages, it stated it would reconsider its ruling on actual damages. After having considered the issue and researched it, the court decided that it had no choice under the law but to limit the damages to the deposit amount and reaffirmed its prior ruling. It is this ruling that we think was in error.

The trial court's discomfort with damages beyond the deposit appears to lie in the fact that the Liens had not paid the full contract price, had not suffered that loss at the time of trial, and therefore could not offer proof of that payment. This absence of proof, however, is traceable to the decision that the Arkansas judgment could not be introduced or referred to. The reasoning behind the trial court's decision that the Arkansas judgment could not be put in evidence and included as an element of damages is not clear in the record, primarily because the Liens agreed they could not use the judgment in that manner.

Big Ridge had argued against the inclusion of the Arkansas judgment as an element of damages on full faith and credit grounds. We think, however, that the possibility of a judgment in favor of the Liens for TCPA violations that might equal, and therefore have the practical effect of negating, the Arkansas judgment was in the contemplation of the appellate court when it ruled that the Liens could pursue their TCPA claims. Obviously, the Liens' right to maintain their action in Tennessee included the right to any remedies available under the TCPA and proved by them. The ruling of an appellate court becomes the law of the case that is binding on the parties and the trial court on remand. *State ex rel. Sizemore v. United Physicians Ins. Risk Retention Group,* 56 S .W.3d 557, 566 (Tenn. Ct. App. 2001).

The Arkansas judgment was based upon a breach of contract. The judgment is fully enforceable, and it would appear Big Ridge has taken steps to execute on it.[8] A Tennessee judgment or verdict for the Liens on a separate cause of action does not impair the enforceability of the Arkansas judgment. While, as a practical matter, the amounts awarded in the separate lawsuits may offset each other, they are each independently enforceable. That is the result of this court's earlier decision in *Lien v. Couch*.

A claim under the TCPA is a distinct cause of action, with its own separate elements and defenses. *Mack's Used Cars*, 824 S.W.2d at 540; *Godwin Aircraft, Inc. v. Houston*, 851 S.W.2d 816, 822 (Tenn. Ct. App. 1993). In *Dixon v. Bryan*, No. 01A01-9707-CV-00371, 1998 WL 867257 (Tenn. Ct. App. Dec. 15, 1998) (*app. den*. June 7, 1999), this court considered a defendant's claim that the plaintiff's execution of the contract precluded recovery for deceptive acts based upon notice in the contract of the allegedly misrepresented fact. This court held that cases holding that a contract is enforceable in such a situation were irrelevant.

> Here, there is no issue regarding whether the contract should be enforced. Rather, the issue is whether [the defendant] should be immunized from liability under the Consumer Protection Act, regardless of any deceptive or fraudulent actions that he may have perpetrated.

*Id*., at * 3.

Similarly, an "as is" clause or similar disclaimer in a contract cannot absolve a seller from liability for Consumer Protection Act violations that led to the contract. *Ganzevoort*, 949 S.W.2d at 297; *Mack's Used Cars*, 824 S.W.2d at 540. "To allow the seller here to avoid liability for unfair or deceptive acts or practices by disclaiming contractual warranties . . . would contravene the broad remedial intent of the Consumer Protection Act." *Mack's Used Cars*, 824 S.W.2d at 540.

The TCPA clearly contemplates that unfair and deceptive practices may induce consumers to enter into contracts that, on their face, are enforceable. Consequently, a buyer who is induced by such acts has several remedies, including rescission of the resulting contract. *Smith v. Scott Lewis Chevrolet*, 843 S.W.2d 9, 13 (Tenn. Ct. App. 1992); *Lorentz v. Deardan*, 834 S.W.2d 316, 318-19 (Tenn. Ct. App. 1992). If a buyer chooses this remedy, he or she may recover the purchase price paid. *Id*. Even where such rescission is not sought, not possible, or not appropriate, the principle remains the same, and a party who is so induced should be relieved from the contractual obligation or compensated for it if it has been paid.

In *Keith v. Howerton*, No. E2000-02703-COA-R3-CV, 2001 WL 984913 (Tenn. Ct. App. Aug. 28, 2001) (no Tenn. R. App. P. 11 application filed), this court held that the defendants in a

---

[8]There is no proof in the record regarding the lien mentioned by the Liens' counsel, because the Liens were not allowed to prove or refer to the underlying judgment. However, from colloquy between the court and counsel, it is apparent the judge was aware of this action which was part of another court file.

TCPA action were entitled to setoff against the damages adjudged against them the amounts due on loans made to the plaintiffs. This court stated that the plaintiffs would receive a windfall if they were allowed to recover the fair market value of the property they had pawned that was subsequently stolen and were "at the same time absolved of their obligations to repay the money loaned and the pawn charges due under the contract." *Id.* at *11. Such is not the case herein, because the Liens have not been absolved of their obligation to pay the contract price. As the Arkansas judgment proves, they are legally obligated to pay that amount.

The jury found that Big Ridge's unfair or deceptive practices, such as the "bait and switch" violation, caused a loss to the Liens. That loss originated in the contract. If the Liens had paid the full contract price, and received no emus, there would be no reasonable basis for asserting that the moneys they paid were not actual damages resulting from the deceptive acts. The fact that they had not paid the full contract price before trial should not preclude their recovery since the contract was not rescinded and they have an enforceable obligation to pay it. It is undisputed that there is a judgment against the Liens based on the contract and that such judgment is enforceable through various remedies, including execution on the Liens' property. We do not believe the law requires that the Liens actually suffer execution or sale of their property before they can claim the obligation or debt incurred as a result of the contract they were induced to sign through the deceptive acts by the defendants.

The Liens waived below the assertion that the Arkansas judgment **is** the loss they suffered.[9] However, the judgment was evidence that the Liens are under an enforceable obligation to pay the full amount of the contract purchase price. We think the Liens were entitled to show they were under an enforceable obligation to pay the contract amount, $65,000, so that the jury could determine damages based upon the Liens' actual loss.

Accordingly, we must reverse the judgment of the trial court and remand the case for a new trial. Costs of the appeal are taxed to the appellees, Big Ridge Emu Farm and Ruth Couch.

 

 

 

_____
PATRICIA J. COTTRELL, JUDGE

---

[9]For purposes of the new trial, we feel compelled to note that it is only because of the waiver that we cannot and do not find error in the exclusion of the judgment itself as an element of damages. Consideration of the judgment as the actual loss would include the interest accrued thereon.